GTE SYLVANIA, INCORPORATED

v.

CONSUMER PRODUCT SAFETY COMMISSION, Richard O. Simpson, Barbara Franklin, Lawrence Kushner, Constance Newman, R. David Pittle, Sadye Dunn, Vince DeLuise.

RCA CORPORATION

v.

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION, Richard O. Simpson, Barbara H. Franklin, Lawrence M. Kushner, Constance E. Newman, R. David Pittle, Sadye E. Dunn, and Vince DeLuise.

The MAGNAVOX COMPANY

v.

Richard O. SIMPSON, Chairman, Consumer Product Safety Commission, Barbara Franklin, Commissioner, Consumer Product Safety Commission, Lawrence Kushner, Commissioner, Consumer Product Safety Commission, Constance Newman, Commissioner, Consumer Product Safety Commission, R. David Pittle, Commissioner, Consumer Product Safety Commission, Sadye Dunn, Secretary, Consumer Product Safety Commission, and Vince DeLuise, Freedom Information Officer, Consumer Product Safety Commission, and the Consumer Product Safety Commission.

ZENITH RADIO CORPORATION

v.

Richard O. SIMPSON, Chairman, Consumer Product Safety Commission, Barbara Franklin, Commissioner, Consumer Product Safety Commission, Lawrence Kushner, Commissioner, Consumer Product Safety Commission, Constance Newman, Commissioner, Consumer Product Safety Commission, R. David Pittle, Commissioner, Consumer Product Safety Commission, Sadye Dunn, Secretary, Consumer Product Safety Commission, and Vince DeLuise, Freedom Information Officer, Consumer Product Safety Commission, and the Consumer Product Safety Commission.

MOTOROLA, INC.

v.

Richard O. SIMPSON, Barbara Franklin, Lawrence Kushner, Constance Newman, R. David Pittle, Sadye Dunn, Vince DeLuise and Consumer Product Safety Commission.

WARWICK ELECTRONICS, INC.

v.

Richard O. SIMPSON, Barbara Franklin, Lawrence Kushner, Constance Newman, R. David Pittle, Sadye Dunn, Vince DeLuise, and Consumer Product Safety Commission.

FORD AEROSPACE & COMMUNICATIONS CORPORATION

v.

Richard O. SIMPSON, Barbara Franklin, Lawrence Kushner, Constance Newman, R. David Pittle, Sadye Dunn, Vince DeLuise, and Consumer Product Safety Commission.

ADMIRAL CORPORATION, a corporation

v.

UNITED STATES of America and Consumer Product Safety Commission and Individually the Members Thereof as Individuals and as Members of the Consumer Product Safety Commission, Richard Simpson, Chairman, Dr. Lawrence Kushner, Vice Chairman, Barbara Hackman Franklin, Commissioner, Constance E. Newman, Commissioner, Dr. R. David Pittle, Commissioner, Sadye E. Dunn, Secretary.

GENERAL ELECTRIC COMPANY

v.

Richard O. SIMPSON, Chairman, R. David Pittle, Commissioner, Lawrence M. Kushner, Commissioner, Constance E. Newman, Commissioner, Barbara Hackman Franklin, Commissioner, Sadye E.

Dunn, Secretary, and Consumer Product Safety Commission.

MATSUSHITA ELECTRIC CORPORATION OF AMERICA, a Corp. of Delaware

v.

CONSUMER PRODUCT SAFETY COMMISSION, Richard O. Simpson, Barbara Franklin, Lawrence Kushner, Constance E. Newman, R. David Pittle, Sadye E. Dunn, Vince DeLuise.

SHARP ELECTRONICS CORPORATION

v.

UNITED STATES CONSUMER PRODUCTS SAFETY COMMISSION, Richard O. Simpson, Barbara H. Franklin, Lawrence M. Kushner, Constance E. Newman, R. David Pittle, Sadye E. Dunn, Vince DeLuise.

TOSHIBA AMERICA, INC.

v.

CONSUMER PRODUCT SAFETY COMMISSION, Richard O. Simpson, Barbara Franklin, Lawrence Kushner, Constance E. Newman, R. David Pittle, Sadye E. Dunn, Vince DeLuise.

Appeal of CONSUMER PRODUCTS SAFETY COMMISSION.

No. 78–1328.

United States Court of Appeals, Third Circuit.

Argued Jan. 8, 1979.

Decided April 30, 1979.

As Amended May 11, 1979.

See also, D.C., 404 F.Supp. 352.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., James W. Garvin, Jr., U. S. Atty., Wilmington, Del., Leonard Schaitman, Mark N. Mutterperl (argued), Attys., Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., for appellant.

Harry L. Shniderman, James M. McHaney, Jr., Covington·& Burling, Washington, D. C., for appellees GTE Sylvania, Incorporated and Ford Aerospace & Communications Corp.

Bernard G. Segal, Charles C. Hileman, III (argued), Deena Jo Schneider, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellee RCA Corp.

Robert W. Steele, Alan M. Grimaldi, Howrey & Simon, Washington, D. C., H. James Conaway, Jr., Young, Conaway, Stargatt & Taylor, Wilmington, Del., for appellee General Electric Co.

Richard J. Abrams, Richards, Layton & Finger, Wilmington, Del., for appellee The Magnavox Co.

Januar D. Bove, Jr., Connolly, Bove & Lodge, Wilmington, Del., for appellee Zenith Radio Corp.

Stephen B. Clarkson, Sullivan, Beauregard, Clarkson, Moss, Brown & Johnson, Washington, D. C., for appellees The Magnavox Company and Zenith Radio Corp.

Walter T. Kuhlmey, Kirkland & Ellis, Chicago, Ill., for appellee Motorola, Inc.

Nancy L. Buc, Weil, Gotshal & Manges, Washington, D. C., for appellee Matsushita Electric Corporation of America.

Peter Garland, J. Portis Hicks, Wender, Murase & White, New York City, for appellee Sharp Electronics Corp.

David Fleischer, Battle, Fowler, Jaffin, Pierce & Kheel, New York City, for appellee Toshiba America, Inc.

Charles S. Crompton, Jr., Potter, Anderson & Corroon, Wilmington, Del., for appellees Motorola, Inc., Matsushita Electric Corporation of America, Inc., Sharp Electronics Corp., and Toshiba America, Inc.

Burton Y. Weitzenfeld, Michael A. Stiegel, Arnstein, Gluck, Weitzenfeld & Minow, Chicago, Ill., Howard M. Berg, Berg, Aber, Heckler & Wyatt, Wilmington, Del., for appellee Warwick Electronics, Inc.

H. Woodruff Turner, Bruce Wiegand, Kirkpatrick, Lockhart, Johnson & Hutchinson, Pittsburgh, Pa., for appellee Admiral Corp.

Alan B. Morrison (argued), Diane B. Cohn, Washington, D. C., for amici curiae Consumers Union of the United States, Inc. and Public Citizen's Health Research Group.

Charles E. Hill, Alan R. Schwartz, Washington, D. C., for amicus curiae Consumer Federation of America.

Before SEITZ, Chief Judge, and GIBBONS and HIGGINBOTHAM, Circuit Judges.

OPINION OF THE COURT

SEITZ, Chief Judge.

The Consumer Product Safety Commission (the Commission) appeals from an order of the district court granting the plaintiffs' request for a permanent injunction prohibiting the Commission's disclosure of certain documents obtained under its statutory information-gathering authority. The Commission had earlier made an administrative determination to release the documents to members of the public under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. This appeal requires us to resolve the parties' dispute concerning whether the Commission must comply with the information disclosure requirements of the Consumer Product Safety Act (CPSA) when it receives a request for documents under the FOIA.

The plaintiffs are twelve manufacturers of television receivers who brought separate actions against the Commission, which were consolidated in the District of Delaware, to prevent the Commission's disclosure of information concerning television-related accidents which they had submitted pursuant to special orders and subpoenas duces tecum issued by the Commission. Amici curiae, the Consumers Union of the United States, Inc. (Consumers Union) and the Public Citizen's Health Research Group (Health Research Group), seek access to that information under the FOIA and have urged this Court to vacate the district court's order for failure of the court and litigants in this action to attempt to join them as parties in compliance with Rule 19 of the Federal Rules of Civil Procedure.

A brief survey of the factual background of this litigation will illuminate the issues joined by the parties and amici. Further factual information may be gleaned from the three published opinions of the district court that form the backdrop to this appeal. *See GTE Sylvania Inc. v. Consumer Product Safety Commission*, 443 F.Supp. 1152 (D.Del.1977) (granting plaintiffs' motion for summary judgment and entering permanent injunction against the Commission); *GTE Sylvania Inc. v. Consumer Product*

*Safety Commission*, 438 F.Supp. 208 (D.Del. 1977) (denying Commission's motion to transfer this action to the District Court for the District of Columbia); *GTE Sylvania Inc. v. Consumer Product Safety Commission*, 404 F.Supp. 352 (D.Del.1975) (granting plaintiffs' motion for a preliminary injunction).

### I.

Shortly after its creation in 1973, the Commission became concerned about the safety of television sets. That concern led to the publication, on March 22, 1974, of a notice of a proposed hearing concerning potential hazards to the public from the operation of television sets and a request that manufacturers submit all reports on television-related accidents that they had collected since 1969. 39 Fed.Reg. 10,929 (1974). Unsatisfied with the manufacturers' response to this request, the Commission issued special orders on May 13, 1974, pursuant to section 27(b)(1) of the CPSA, 15 U.S.C. § 2076(b)(1), requiring twenty-five television manufacturers to submit the information previously requested. In the cover letter accompanying the special orders the Commission encouraged compliance by stating that the information would be received in confidence and not made available to the public, at least initially. The Commission, noting the possibility that the submitted information might be the object of FOIA requests, instructed the manufacturers to identify documents claimed to be exempt from public disclosure. Most of the manufacturers followed this suggestion.

Still unsatisfied with the amount of data supplied by the manufacturers, the Commission, on July 26, 1974, issued subpoenas duces tecum to certain manufacturers, including all of the plaintiffs here, ordering each of them to furnish the Commission with "TV-related accident reports." The statutory authority for the issuance of such subpoenas is contained in section 27(b)(3) of the CPSA, 15 U.S.C. § 2076(b)(3).

The district court found, in its opinion granting plaintiffs' request for a preliminary injunction, that the Commission's definition of the data to be submitted was quite broad and was designed to include reports of accidents received by the manufacturers that were incomplete, unverified and even incorrect. Moreover, the court found that the Commission had never clearly defined a "TV-related accident," generating confusion among the manufacturers and causing the Commission itself to recognize that, while some manufacturers had submitted reports pertaining only to accidents caused by fire and electrical shock, others had included reports of accidents caused by TV tube implosions, carrying handle failures, unstable TV stands, and so forth. Other factors which would render the data collected by the Commission misleading for purposes of safety comparison among sets manufactured by different companies include the Commission's failure to enforce full compliance with the subpoenas and the fact that some manufacturers were, in the Commission's words, "more conscientious than others in maintaining television accident files." *See* 404 F.Supp. at 358–65.

In June, 1974, Consumers Union and the Health Research Group sought access under the FOIA to the accident reports submitted by the manufacturers in response to the Commission's special orders. The Commission considered the requests as applicable as well to information it later received pursuant to the subpoenas duces tecum. The Commission informed the manufacturers of these requests on August 2, 1974, and asked them to substantiate the claims that they had earlier made for exemptions from public disclosure. Meanwhile, the Commission retained a private firm to assist in the processing, analysis and summarization of the submitted accident reports. The information abstracted from each report was computerized and a computer print-out was prepared listing each accident reported by a manufacturer and cataloguing it by type. This printout does not account in any way for the factors found by the district court to render the data misleading for purposes of comparison. A Commission consultant also prepared a report summarizing the broad outlines of the data using industry-wide

statistics. That report, unlike the print-out, does not identify particular manufacturers or television models, and its disclosure was not enjoined by the district court. *See* 443 F.Supp. at 1163.

After considering the manufacturers' claims of exemption from disclosure under the FOIA, the Commission decided to release to the requesters all of the TV-related accident data it had compiled, including the print-out, except for information identifying accident victims by name and documents subject to the work product doctrine and attorney-client privilege. This decision was based upon a memorandum prepared by the Commission's Office of General Counsel, which concluded that, "The release of the accident data would assist consumers to better evaluate the safety of TVs." The Commission informed the manufacturers of its final decision on April 8, 1975, and noted that the release of the data to the public would be accompanied by a disclaimer stating that "the information could be misleading because some television manufacturers maintained more complete accident records than other manufacturers."

The Commission's decision to release the submitted accident data and reports derived therefrom prompted the plaintiffs to commence suits in various federal judicial districts. After those actions were consolidated in the District of Delaware at the Commission's request and temporary restraining orders prohibiting disclosure were consented to by the Commission, the district court received briefs and heard oral argument on plaintiffs' request for a preliminary injunction. The plaintiffs contended that the Commission's release of the information submitted by them was barred by exemp-

tions to the FOIA, by 18 U.S.C. § 1905, and by section 6 of the CPSA, 15 U.S.C. § 2055.

The district court held that it had jurisdiction over the subject matter of this suit under 28 U.S.C. § 1337, and that the Commission's decision to release the information requested was a final administrative determination subject to review under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06. 404 F.Supp. at 365–67. This Court has subsequently agreed that "the APA provides a cause of action for enjoining an agency from disclosing submitter-generated information." *Chrysler Corp. v. Schlesinger*, 565 F.2d 1172, 1190 (3d Cir. 1977) (footnote omitted), *aff'd in relevant part sub nom., Chrysler Corp v. Brown,* —— U.S. ——, ——, 99 S.Ct. 1705, 59 L.Ed.2d 208 (1979).[1]

After reviewing the administrative record, the court determined that the plaintiffs were entitled to a preliminary injunction based, in part, on their reasonable probability of success on the merits of their claim that the Consumer Product Safety Act itself barred the release of the requested information.

Section 6(b)(1) of the CPSA provides that the Commission shall, 30 days prior to the public disclosure of information obtained under the Act identifying individual manufacturers, notify those manufacturers and provide them with a reasonable opportunity to comment upon the information to be disclosed. Furthermore, prior to its public disclosure of information from which the identities of manufacturers may be readily ascertained, the Commission is required to take reasonable steps to assure that the information is accurate and that disclosure is fair in the circumstances and reasonably

---

1. The Supreme Court's opinion in *Chrysler Corp. v. Brown* held that review of an agency decision to disclose data submitted by a private party is available under the APA, at least where an agency disclosure decision is not "committed to agency discretion by law" within the meaning of 5 U.S.C. § 701(a)(2). Just as the Court found that 18 U.S.C. § 1905 placed substantive limits on the agency action challenged in *Chrysler Corp. v. Brown,* so too it is obvious that the Commission's disclosure decisions are not committed to agency discretion

by law given the limitations on disclosure contained in section 6(b)(1) of the CPSA, 15 U.S.C. § 2055(b)(1). *See* —— U.S. at ——, 99 S.Ct. 1705.

The Court in *Chrysler Corp. v. Brown* found jurisdiction to review agency disclosure decisions under the APA under the general federal question jurisdictional grant in 28 U.S.C. § 1331. *Id.* at ——, n.47, 99 S.Ct. 1705. The district court's determination that subject matter jurisdiction of this suit existed under 28 U.S.C. § 1337 has no effect on this appeal.

related to effectuating the purposes of the CPSA.

The district court rejected the Commission's contention that section 6(b)(1) does not apply to the disclosure of information pursuant to an FOIA request, and concluded that that section specifically exempted the requested information from disclosure within the meaning of FOIA Exemption 3, 5 U.S.C. § 552(b)(3). 404 F.Supp. at 369–70. Furthermore, the court found that the Commission's release of the TV-related accident data would run afoul of all three of its affirmative obligations under section 6(b)(1) in that the Commission had not taken reasonable steps to assure that the information, from which the identity of the plaintiff manufacturers could be readily ascertained, was accurate, and in that disclosure of the requested information was neither fair in the circumstances nor reasonably related to effectuating the purposes of the CPSA. *Id.* 370–73. Concluding that the plaintiffs had also borne their burden of proof on the other requirements for a preliminary injunction, the district court granted the requested relief. *Id.* 373–75.

In July, 1977, the plaintiffs filed motions to make the preliminary injunction permanent. After the district court had denied the Commission's motion to transfer this litigation to the District of Columbia, where the requesters had commenced an action against the Commission and the manufacturers seeking enforcement of their FOIA request, the court ruled on the parties' cross-motions for summary judgment. Concluding that the Commission had presented no new facts warranting the modification of its earlier findings, and that no changes in the law had affected the validity of the legal reasoning in its earlier opinion, the district court held that the TV-related accident data, other than the consultant's report summarizing industry-wide statistics, was exempt from public disclosure by reason of the Commission's contin-

ued failure to comply with section 6(b)(1) of the CPSA. An order enjoining the Commission from disclosing the data to the public was entered on December 8, 1977. *See* 443 F.Supp. at 1162–63.[2] This appeal followed.

## II.

It was the FOIA requests of the Consumers Union and the Health Research Group that prompted the Commission's decision to release the TV-related accident data and, in turn, triggered the manufacturers' decision to commence this litigation. However, in none of the individual actions brought by the manufacturers were the requesters named as parties. Nor have the Commission and the manufacturers made any subsequent effort to add the requesters as parties to this lawsuit. Similarly, up until the filing of this appeal, the requesters have made no move to intervene in this lawsuit. Rather, they chose to file a separate FOIA suit in the District of Columbia on May 5, 1975, joining all of the plaintiffs in this suit and the Commission as defendants.

The progress of the requesters' action in the District of Columbia has been tortuous. The district court dismissed their complaint on September 12, 1975, for failure to present a case or controversy with respect to the Commission and failure to state a claim upon which relief could be granted against the manufacturers. That holding was based on the fact that the Commission was the only party which could afford the requesters the relief they sought under the FOIA, and that there was complete agreement between the requesters and the Commission on the central question of whether the documents at issue should be released. *Consumers Union of United States, Inc. v. Consumer Product Safety Commission,* 400 F.Supp. 848 (D.D.C.1975). The Court of Appeals reversed the order dismissing the requesters' complaint on July 5, 1977, hold-

---

2. We do not read the court's order as enjoining the disclosure of TV-related accident information with respect to which the Commission has complied with the requirements of section 6(b)(1). However, the Commission has not ar-

gued before this Court that it has taken, or intends to take, the reasonable steps required by section 6(b)(1) with respect to the material at issue.

ing that the parties' dispute over the scope and effect of the preliminary injunction that had been entered by the district court in this case "fully satisfie[d] the Article III case or controversy requirement." *Consumers Union of United States, Inc. v. Consumer Product Safety Commission*, 182 U.S.App.D.C. 351, 356, 561 F.2d 349, 354 (1977) (footnote omitted). In discussing that dispute, the Court of Appeals incorrectly assumed that the Delaware litigation had run its course without a final adjudication of the issue presented. *Id.*, 182 U.S.App.D.C. 358, 561 F.2d 356. Rehearing was denied in spite of the fact that the manufacturers later moved in this case to make the preliminary injunction permanent. In a per curiam opinion attached to the order denying rehearing the court noted that the requesters were not parties to the Delaware litigation and stated that because all the necessary parties were present before the district court in the District of Columbia "there appears no reason why the litigation should not proceed here, particularly since this is the venue authorized by the FOIA." 184 U.S.App.D.C. 146, 147, 565 F.2d 721, 722 (1977).

While the manufacturers' petition for a writ of certiorari was pending the district court in Delaware entered its order granting their request for a permanent injunction. The Supreme Court granted certiorari, vacated the judgment of the Court of Appeals for the District of Columbia Circuit, and remanded the case "for further consideration in light of the permanent injunction . . . ." *GTE Sylvania, Inc. v. Consumers Union of United States, Inc.*, 434 U.S. 1030, 98 S.Ct. 761, 54 L.Ed.2d 778 (1978). On remand, the Court of Appeals held that the permanent injunction obtained by the manufacturers in this litigation did not bar the requesters from litigating their separate FOIA action. *Consumers Union of United States, Inc. v. Consumer Product Safety Commission*, 192 U.S.App. D.C. 93, 590 F.2d 1209 (1978), *petition for cert. filed* (No. 78–1248) (Feb. 19, 1979).

Appearing as amici curiae in this appeal, the requesters argue that the district court erred in failing to require the parties to this lawsuit to join them as defendants pursuant to Rule 19 of the Federal Rules of Civil Procedure. They ask this Court to vacate the judgment below and direct the plaintiffs to attempt to join them as parties defendant. In the event such joinder is found to be impossible because of inability to obtain personal jurisdiction over them or improper venue, they ask us to direct the district court to dismiss this action pursuant to Rule 19(b) or to transfer it to the District of Columbia pursuant to 28 U.S.C. § 1404(a).

Rule 19(a) states:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. . . .

Rule 19(b) states that when a person described in Rule 19(a)(1) or (2) cannot be made a party to an action

the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an

adequate remedy if the action is dismissed for nonjoinder.

Amici's arguments in support of their contention that the judgment obtained by the plaintiffs must be vacated have focused, in part, on the impact of Rule 19 on "reverse-FOIA" suits generally. They ask this Court to hold that Rule 19 requires that parties to such suits must join known persons who have requested the material at issue unless those requesters formally notify the district court of their willingness to permit the agency to represent their interests. Amici support a similar rule for FOIA suits in which the plaintiffs know of persons who have submitted the information requested from the agency and who would oppose its release.

The District of Columbia Circuit has suggested, in its most recent examination of the procedural problems manifested in this litigation, that "reverse-FOIA plaintiffs may find that, to prevent judgments in their favor from becoming nugatory, they must join in their lawsuits anyone whose request for information quickened the submitter's controversy with the agency—or perhaps even, by way of a defendant class action, all those who likely may subsequently make such requests." *Consumers Union of United States, Inc., supra,* 192 U.S.App. D.C. at 104, 590 F.2d at 1220 (footnote omitted). Moreover, the court there concluded that the interests designed to be served by Rule 19 "surely demanded dismissal of the manufacturers' Delaware suit, or at least an injunction shaped to impact to the smallest possible extent upon the absent requesters' interest." *Id.* 192 U.S.App.D.C. 105, 590 F.2d 1221.

■■ We decline the invitation to attempt at this time to develop a set of general procedural rules governing the effect of non-joinder of requesters, whether known or hypothetical, on a submitter's reverse-FOIA action.[3] We do recognize, in deciding

the case before us, however, that the Supreme Court has held that a court of appeals should, on its own initiative, take steps to protect an absent party through consideration of the Rule 19 issue, even when that issue was not presented to the district court nor raised by the parties to the appeal. *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 111, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

■■■ In addressing the issue raised by amici we will assume that they are parties who, within the terms of Rule 19(a)(2), claim an interest in the subject of this action and who are so situated that the disposition of this action in their absence may impair or impede their ability to protect that interest in the District of Columbia litigation. Furthermore, it is self-evident that the non-joinder of the requesters has left the Commission subject to a substantial risk of incurring inconsistent obligations with respect to the disclosure of the TV-related accident data. Nonetheless, we emphasize that the Supreme Court has made it clear that in deciding the Rule 19 issue when first raised on appeal the reviewing court must consider the fact that a judgment binding on the parties has already been reached after extensive litigation. *See Provident Bank, supra,* 390 U.S. at 109, 88 S.Ct. 733. Viewing the interests served by Rule 19 as they apply to this case "entirely from an appellate perspective," *id.,* we conclude that amici's contention must be rejected.

Here, as in *Provident Bank,* the plaintiffs' interest in having a forum has been greatly enhanced by "a strong additional interest in preserving [their] judgment." *Id.* 110, 88 S.Ct. 738. Were this Court to vacate the permanent injunction entered by the district court solely because of the requesters' non-joinder, that interest would be destroyed. Second, we may assume that consideration of the Commission's interest in avoiding the possibility that the relief

3. Congress has recognized the need to limit the amount of litigation arising out of a single FOIA request. *See* House Comm. on Government Operations, *Freedom of Information Act Requests for Business Data and Reverse-FOIA*

*Lawsuits,* H.R.Rep.No.95–1382, 95th Cong., 2d Sess. 64–65, *reprinted in* [1979] U.S.Code Cong. & Admin.News pp. [3], [66–67] (recommending amendment of the FOIA to provide rules governing the venue of reverse-FOIA lawsuits).

granted the manufacturers in this suit will be inconsistent with the judgment eventually entered in the District of Columbia litigation has been foreclosed by the Commission's failure to assert that interest in a timely fashion during the proceedings below. *Id.* Significantly, the Commission has vigorously argued on appeal that equity demands that amici not be permitted to overturn the judgment obtained in the Delaware litigation by raising the Rule 19 issue at this late date.

Although the interest of the amici in the subject matter of this lawsuit is clear, and their joinder as parties in the district court would have been desirable, we also note that they had adequate notice of this action prior to commencing their own lawsuit and that they could have intervened in the Delaware litigation without significant burden. Amici concede that their decision not to intervene was based on a desire to present their case in a forum that was more convenient and perceived as less hostile to their interests. In *Provident Bank, supra* at 114, 88 S.Ct. 733, the Court reserved decision on the question whether such a purposeful bypass of an adequate opportunity to intervene in pending litigation might estop a non-party from relitigating an issue decided in that case. Here, the District of Columbia Circuit has already ruled that amici will not be so bound by the judgment in this case. Without expressing any view as to the merits of that holding, we conclude that the amici's decision to raise the Rule 19 issue in the Delaware litigation only after the entry of a final judgment by the district court that was adverse to their interests undermines their contention that the parties' noncompliance with Rule 19 compels this Court to vacate that judgment.

Finally, we must consider the interests of the judicial system and the public in the complete, consistent and efficient settlement of controversies. Although ordinarily consideration of that factor would counsel in favor of requiring the joinder of interested parties, *Provident Bank* requires that, when viewed from an appellate perspective, such consideration "include the fact that the time and expense of a trial have already been spent." *Id.* 111, 88 S.Ct. 739.

Thus, even assuming that it may have been appropriate for the district court to have dismissed this action or transferred it to the District of Columbia upon consideration of the Rule 19 issue prior to its entry of final judgment, we conclude that the interests of all the parties to this suit and the public interest dictate that amici's contention be rejected. The possibility that the district court's order might be modified to accommodate the interests of amici, which we may require as a condition of affirmance under *Provident Bank, supra* at 112, 88 S.Ct. 733, is discussed in Part IV.

### III.

In reaching the merits of this appeal, we note at the outset that the Commission does not dispute the accuracy of the district court's factual determinations.[4] The court found that "the information obtained from the plaintiffs which the Commission proposes to release would be misleading to the consumer who attempted to use it for evaluating the relative safety of TV receivers manufactured by the plaintiffs." 404 F.Supp. at 365. The court also found that the Commission did not take reasonable steps to assure that the information to be disclosed was accurate and that the release of the information "could unjustifiably damage the manufacturers because the data does not form a reliable foundation for safety comparison." *Id.* 372 (footnote omit-

---

4. In *Chrysler Corp. v. Brown* the Supreme Court did not reach the question whether Chrysler was entitled to a trial *de novo* on its claim that the agency disclosure at issue exceeded the bounds of statutory authority. —— U.S. at ——, 99 S.Ct. 1705. In this appeal, the Commission has not contended that the district court's review of its determination to release the TV-related accident data to the requesters went beyond the administrative record, nor have the manufacturers contended that *de novo* review was appropriate. Thus, we need express no view on the question whether Commission decisions to disclose information under section 6(b)(1) of the CPSA may be set aside by a reviewing court as "unwarranted by the facts" after a trial *de novo*. *See* 5 U.S.C. § 706(2)(F).

**800**

ted). Moreover, at oral argument, the Commission conceded that it could not affirmatively release the material at issue in the form of a press release or Commission report because of its non-compliance with section 6(b)(1) of the CPSA. (Tr. of Oral Argument at 3–4).

■■■ The issue raised by the Commission on appeal is that the requirements of section 6(b)(1) are only applicable to the "affirmative disclosure" of information—Commission press releases, publications and the like—and that the district court erred in finding those requirements applicable to the Commission's "passive release" of information pursuant to an FOIA request. The Commission also contends that the district court erred in holding that section 6(b)(1) is a statute exempting material from disclosure within the meaning of Exemption 3 of the FOIA, 5 U.S.C. § 552(b)(3).

The Commission is supported in its legal assertions by the Consumer Federation of America, which filed an amicus brief with this Court. Amicus argues that section 6(b)(1) does not meet the definition of a withholding statute in Exemption 3 because its criteria for withholding lack sufficient particularity; the Commission argues that section 6(b)(1) is not a withholding statute because it does not by its terms exempt materials from disclosure pursuant to the FOIA. Thus, the Commission's argument on the Exemption 3 issue is based solely on its interpretation of the scope of section 6(b)(1) itself.

This Court stated in *Chrysler Corp. v. Schlesinger, supra,* 565 F.2d at 1192, that in reverse FOIA cases under the APA a reviewing court should first inquire whether any nondisclosure statute or regulation is applicable to the material the agency intends to release. "If so, the court must conclude that the agency has acted outside the scope of its statutory authority and should enjoin disclosure." *Id.* If no nondisclosure statute is found applicable the reviewing court must then determine whether the contested information falls within an FOIA exemption and, if so, whether the agency has considered the proper factors in

determining that disclosure was permitted, nonetheless, under its own disclosure regulations. *Id.*

■■■ Because the exemptions to the FOIA are permissive rather than mandatory, agencies may establish more liberal disclosure policies than the FOIA requires. *See Chrysler Corp. v. Brown, supra,* —— U.S. at —— – ——, 99 S.Ct. 1705. The Commission has evidently adopted such a policy of liberal disclosure. Of course, the Supreme Court's decision in *Chrysler Corp. v. Brown* makes it clear that such a policy will not prevail over a specific statutory command that the information at issue cannot be disclosed. Thus, we first turn to the question whether section 6(b)(1) is a nondisclosure statute that is applicable to the Commission's proposed release of the TV-related accident data.

### A.

Section 6(b)(1) provides for a 30 day notice and comment period prior to the Commission's disclosure of information obtained under the CPSA which identifies individual manufacturers. It also provides that the Commission shall take reasonable steps prior to such disclosure to assure the accuracy of the information disclosed and that disclosure is fair in the circumstances and reasonably related to effectuating the purposes of the CPSA. If the Commission finds that it has made public disclosure of inaccurate or misleading information reflecting adversely on manufacturers' products or practices, it is required to publish a retraction in a manner similar to that in which disclosure was made.

The FOIA, on the other hand, requires that, upon a request for agency records, the agency shall determine within ten working days whether or not it will comply with that request and immediately notify the requesting party of its determination and reasons therefor, and of his right to appeal an adverse determination to the head of the agency. If an appeal is taken it is to be resolved by the agency within twenty working days. In the presence of certain

defined "unusual circumstances" either of these two time limitations may be extended for an additional ten working days upon written notice to the requesting party. 5 U.S.C. § 552(a)(6)(A) & (B). Once the agency determines that it will comply with an FOIA request, actual disclosure is to be prompt. 5 U.S.C. § 552(a)(6)(C).

The Commission, based on its reading of section 6(b)(1) and its legislative history, and noting inconsistencies between the time limitations set forth in that provision and the FOIA, has taken the position throughout this litigation that section 6(b)(1) is inapplicable to the release of information pursuant to an FOIA request. That position has recently been approved by the Court of Appeals for the Second Circuit in *Pierce & Stevens Chemical Corp. v. United States Consumer Product Safety Commission*, 585 F.2d 1382 (2d Cir. 1978). In adopting the Commission's interpretation of section 6(b)(1) that court noted that "[t]he questions . . . posed are not easy to resolve," *id.* 1386, but held that the language of the CPSA, contemporaneous and subsequent legislative history, and the inconsistencies between its provisions and those of the FOIA, all led to the conclusion that the public disclosure requirements of the CPSA were not meant to be applied to FOIA requests.

The Commission's position on the issue raised in this appeal has been set forth in proposed rules governing its implementation of section 6(b)(1). *See* 42 Fed.Reg. 54,304 (1977) (to be codified at 16 C.F.R. § 1013). Section 1013.2 of the proposed rules provides that they apply to Commission "publications and publicity pertaining to consumer products . . . created or adopted by a . . . Commission officer or employee for dissemination to the general public or distribution to news media." The Supplementary Information accompanying the proposed rules states that section 1013.2 "expresses the Commission's interpretation that section 6(b) . . . is applicable when the [Commission] actively and publicly discloses information, but not when the [Commission] makes a record available in response to a Freedom of Information Act request . . . ." 42 Fed.Reg. 54,-305.

■ The Commission asks this Court to accept its interpretation of section 6(b)'s scope as one reasonably related to the purposes of the CPSA, and contends that its interpretation is entitled to great weight as the "contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion." *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The plaintiffs counter that the Commission's interpretation of section 6(b) is entitled to no deference, characterizing it as an attempt to influence the outcome of this litigation and noting that it "was no sooner made than challenged." *See Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 156, 64 S.Ct. 474, 481, 88 L.Ed. 635 (1944). Recognizing that we are not here being called upon to review a regulation that has already been promulgated pursuant to the provisions of the APA, we believe that the degree of deference to be afforded the Commission's interpretation of the statute should approximate that which would be afforded an agency's interpretative rule. *Cf. Chrysler Corp. v. Brown, supra,* —— U.S. at ——, 99 S.Ct. at 1724 ("We need not decide whether these regulations are properly characterized 'interpretative rules.' It is enough that such regulations are not properly promulgated as substantive rules, and therefore not the product of procedures which Congress prescribed as necessary prerequisites to giving a regulation the binding effect of law.").

■ We note that the Supreme Court has recognized that where such important interests as "the public's access to information in the Government's files and concerns about personal privacy and business confidentiality" are in conflict, an agency may reach a conclusion that a different accommodation of those interests is appropriate after interested parties have had notice and an opportunity to comment. *Id.* at ——, 99 S.Ct. at 1725. Thus, in this situation where the procedures of the APA have not yet been

complied with respecting the Commission's proposed rule, we shall give the Commission's interpretation such weight as it is deserving, based on the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . . ." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). We also shall be guided by the Supreme Court's admonition that even the existence of a well-reasoned prior administrative practice of long standing does not relieve a reviewing court of the "responsibility to determine whether that practice is consistent with an agency's statutory authority." *Securities & Exchange Commission v. Sloan*, 436 U.S. 103, 118, 98 S.Ct. 1702, 1712, 56 L.Ed.2d 148 (1978).

## B.

In resolving the Commission's contention that the district court erred in rejecting its interpretation of section 6(b)(1) we shall look first to the language of the CPSA, then to relevant indicators of legislative intent, and finally to the averred inconsistencies between its requirements and those of the FOIA. Sections 6(a) and (b) of the Consumer Product Safety Act, Pub.L. No. 92–573, 86 Stat. 1212 (1972), provide:

(a)(1) Nothing contained in this chapter shall be deemed to require the release of any information described by subsection (b) of section 552 of Title 5 or which is otherwise protected by law from disclosure to the public.

(2) All information reported to or otherwise obtained by the Commission or its representative under this chapter which information contains or relates to a trade secret or other matter referred to in section 1905 of Title 18 shall be considered confidential and shall not be disclosed, except that such information may be disclosed to other officers or employees concerned with carrying out this chapter or when relevant in any proceeding under this chapter. Nothing in this chapter shall authorize the withholding of infor-mation by the Commission or any officer or employee under its control from the duly authorized committees of the Congress.

(b)(1) Except as provided by paragraph (2) of this subsection, not less than 30 days prior to its public disclosure of any information obtained under this chapter, or to be disclosed to the public in connection therewith (unless the Commission finds out that the public health and safety requires a lesser period of notice), the Commission shall, to the extent practicable, notify, and provide a summary of the information to, each manufacturer or private labeler of any consumer product to which such information pertains, if the manner in which such consumer product is to be designated or described in such information will permit the public to ascertain readily the identity of such manufacturer or private labeler, and shall provide such manufacturer or private labeler with a reasonable opportunity to submit comments to the Commission in regard to such information. The Commission shall take reasonable steps to assure, prior to its public disclosure thereof, that information from which the identity of such manufacturer or private labeler may be readily ascertained is accurate, and that such disclosure is fair in the circumstances and reasonably related to effectuating the purposes of this chapter. If the Commission finds that, in the administration of this chapter, it has made public disclosure of inaccurate or misleading information which reflects adversely upon the safety of any consumer product, or the practices of any manufacturer, private labeler, distributor, or retailer of consumer products, it shall, in a manner similar to that in which such disclosure was made, publish a retraction of such inaccurate or misleading information.

(2) Paragraph (1) (except for the last sentence thereof) shall not apply to the public disclosure of (A) information about any consumer product with respect to which product the Commission has filed an action under section 2061 of this title (relating to imminently hazardous prod-

ucts), or which the Commission has reasonable cause to believe is in violation of section 2068 of this title (relating to prohibited acts), or (B) information in the course of or concerning any administrative or judicial proceeding under this chapter.

15 U.S.C. §§ 2055(a) & (b).

The language of section 6 reveals that the Congress which enacted it was aware of the likelihood that the Commission would be called upon to release documents under the FOIA which it had obtained pursuant to its broad information-gathering authority. Thus, section 6(a)(1) reaffirms that the Commission is not required to release information that is within the exemptions to the FOIA, 5 U.S.C. § 552(b). Section 6(a)(2) creates an absolute prohibition on the Commission's release, by any means, of trade secrets and other information protected by 18 U.S.C. § 1905.

The Commission concedes that the scope of section 6(a) includes FOIA requests, but argues that section 6(b) is applicable only to the public disclosure of information initiated by the Commission. The Second Circuit opinion in *Pierce & Stevens* also adopted this position.

Section 6(a) of the Consumer Product Safety Act specifically incorporates the nine exemptions of the FOIA by reference, and repeats the flat prohibition on disclosing trade secrets and other confidential commercial matter. We believe that in this statute affecting only commercial enterprises, Congress did not intend to reduce disclosure called for by the FOIA when a person requests documents, but to leave that situation unchanged. On this view, section 6(a) incorporates the FOIA exemptions with understandable emphasis, in this commercial setting, on absolute protection for trade secrets and similar information, and section 6(b)(1) provides a unique procedure to deal with the problem of unfairness which may occur when a government agency focuses adverse publicity on a particular business enterprise.

585 F.2d at 1388. Our examination of the statute and its legislative history will focus, then, on indicia of congressional intent to make this distinction between the scope of sections 6(a) and 6(b).

The Commission argues, in reading section 6(b)(1) itself, that Congress, in using the term "public disclosure" implied that the provisions contained therein were not designed to limit the Commission's authority to simply release information to members of the public upon request. The Second Circuit opinion draws a similar inference from the language of the section. *See Pierce & Stevens, supra*, 585 F.2d at 1387. Both sections 6(a) and 6(b), however, are included in a single provision entitled "Public disclosure of information." Thus, we view the semantic distinction as unpersuasive. Furthermore, we would hesitate to ascribe to Congress a belief that "public disclosure" would be plainly understood by those called upon to interpret the CPSA as not encompassing disclosure to members of the public through the FOIA.

The Commission also relies upon the retraction provisions of section 6(b)(1) as textual support for its interpretation of the section's scope. Thus, it argues that it makes no sense for the Commission to be required to publish a retraction of inaccurate or misleading information in a manner similar to that in which disclosure was made when the method of disclosure was mere compliance with an FOIA request. The Second Circuit opinion also relied on the retraction provision as evidence that section 6(b)(1) was directed toward agency-initiated publicity. *See Pierce & Stevens, supra* at 1387. We believe, however, that where the Commission had released information under the FOIA that it later learned was inaccurate and which reflected adversely upon identifiable manufacturers it conceivably could "publish a retraction" in a similar manner by releasing corrective information to the same FOIA requesters who had received the earlier inaccurate material. Thus, the retraction provision, on its face, is not persuasive evidence of congressional intent to limit section 6(b)(1) to disclosure initiated by the Commission.

In a related vein, the Commission argues that section 6(b)(1) requires it to take reasonable steps to assure the accuracy of information to be disclosed, steps which might include rewriting a document, while the FOIA does not contemplate such review and rewriting but only the disclosure of existing documents. *Accord Pierce & Stevens, supra* at 1388. However, if the specific requirements of section 6(b)(1) apply to disclosure made in compliance with FOIA requests, the Commission may find, after taking reasonable steps to assure accuracy and fairness, that existing documents cannot be released in any form. The appropriate posture of the Commission in such cases would be to deny the request for the inaccurate material. If the Commission chose, as a matter of policy, to comply as best it was able with such a request, section 6(b)(1) could be accommodated by releasing the information in an accurate and fair form in a newly-created document. Thus, the reasonable steps requirement of section 6(b)(1) also does not evidence a congressional intent to limit its scope to affirmative disclosure by the Commission.

Most significantly, from our viewpoint, section 6(b) contains specific exceptions to its requirements in section 6(b)(2). The list of those exceptions does not include the release of information pursuant to the FOIA. We believe that it is reasonable to assume that if Congress intended to make the distinction between the scope of sections 6(a) and (b) that the Commission argues for here, it would have done so explicitly in section 6(b)(2).

In reviewing the language of section 6(b)(1) within the total context of the CPSA we note that section 25(c), 15 U.S.C. § 2074(c), states that certain information generated by the Commission shall be made available to the public subject to the requirements of sections 6(a)(2) and 6(b), "but notwithstanding" the provisions of section 6(a)(1). Section 25(c) designates accident and investigation reports which do not identify injured parties and their physicians, and reports on research and demonstration projects as "public information," notwithstanding the fact that they might be ex-

empted from disclosure under the FOIA. But the Commission must determine that those reports do not contain trade secrets protected by 18 U.S.C. § 1905 (incorporated by reference in section 6(a)(2)) and must comply with section 6(b) prior to making the reports public. Thus, section 25(c) makes section 6(b) applicable to at least some information obtained or generated by the Commission, the disclosure of which could be requested under the FOIA.

The only other reference to section 6(b) within the other provisions of the CPSA is contained in section 29(e), 15 U.S.C. § 2078(e). Section 29, entitled "Cooperation with States and other Federal agencies," was amended by the Consumer Product Safety Commission Improvements Act of 1976, Pub.L. No. 94–284, § 15, 90 Stat. 510, to include a new subsection governing the public disclosure of information received from the Commission by other agencies engaged in activities relating to health, safety or consumer protection. New section 29(e) provides, in pertinent part, that no such agency

may disclose to the public any information contained in a report received by the agency or authority under this subsection unless with respect to such information the Commission has complied with the applicable requirements of section [6(b)].

15 U.S.C. § 2078(e). On its face, section 29(e) adds no weight to the Commission's interpretation of the scope of section 6(b)(1). However, in the Conference Report accompanying the Improvements Act, the conferees stated:

The requirement that the Commission comply with section 6(b) prior to another Federal agency's public disclosure of information obtained under the Act is not intended by the conferees to supersede or conflict with the requirements of the Freedom of Information Act (5 U.S.C. § 552(a)(3) and (a)(6)). *The former relates to public disclosure initiated by the Federal agency while the latter relates to disclosure initiated by a specific request from a member of the public under the Freedom of Information Act.*

H.R.Conf.Rep. No. 94–1022, 94th Cong., 2d Sess. 27 [hereinafter *Improvements Act Conference Report*], *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 993, 1017, 1029 (emphasis supplied). Not surprisingly, the Second Circuit afforded this passage some weight in affirming the Commission's interpretation of the scope of section 6(b)(1). *See Pierce & Stevens, supra* at 1387 & n. 23. Our evaluation of the effect of the intent of the conferees in adding section 29(e) to the CPSA on the interpretation to be given section 6(b)(1) is treated below.

In sum, the terms of the statute itself suggest that Congress was aware of the interplay between the public information provisions of the Consumer Product Safety Act and the FOIA. Section 6, viewed as a whole, applies to both Commission-initiated disclosure and the release of information pursuant to the FOIA. While the Commission argues that section 6(b)(1) was only meant to apply to the former methods of disclosure, Congress did not include the disclosure of information pursuant to an FOIA request among the exceptions to the requirements of that section. We are not persuaded that the language of section 6(b)(1), its requirement that the Commission take reasonable steps to assure the accuracy of disclosed information, and its retraction provisions, rebut the resulting inference that Congress intended section 6(b)(1) to apply to all forms of disclosure by the Commission. To the contrary, the Congress that enacted section 6(b)(1) also enacted section 25(c), which in our view, clearly implies that the former provision is applicable to some types of information obtained or generated by the Commission, whether it is to be "affirmatively released" or released to FOIA requesters. The language of the statute is, of course, not conclusive in resolving this issue. Thus, we must turn to the Act's legislative history, and an analysis of subsequent legislative events cited by the Commission, as aids to divining congressional intent.

### C.

The origins of the provisions of section 6 of the CPSA, as finally enacted, are tracea-ble to H.R. 8110, a bill introduced in the House on behalf of the Administration. The conference committee which approved the final version of the Act noted that its provisions governing information disclosure were drawn from the House bill, H.R. 15003. *See* H.R.Conf.Rep. No. 92–1593, 92d Cong., 2d Sess. 41 [hereinafter *Conference Report*], *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 4573, 4596, 4633. Section 6 of H.R. 15003, as passed by the House on September 20, 1972, was identical in all significant respects to section 6 as it was enacted. *See* 118 Cong.Rec. 31,411 (1972). Furthermore, section 6 of H.R. 15003, as passed by the House, was identical, in all respects significant to this case, to the version of the bill that was reported out of the House Committee on Interstate and Foreign Commerce on June 20, 1972. *See* H.R. Rep. No. 92–1153, 92d Cong., 2d Sess. 5 (1972) [hereinafter *House Report*]. However, the hearings before the Subcommittee on Commerce and Finance which preceded the full committee's favorable report on H.R. 15003 reveal that two significantly different versions of what eventually became section 6 were considered by the committee. *See Consumer Product Safety Act: Hearings Before the Subcomm. on Commerce and Finance of the Comm. on Interstate and Foreign Commerce*, 92d Cong., 1st & 2d Sess. (1971–72) [hereinafter *Subcommittee Hearings*].

The Subcommittee on Commerce and Finance considered two basic versions of proposed legislation on consumer product safety. One version, supported by the Administration, would have created a consumer product safety program within the Department of Health, Education and Welfare (HEW). The second version, typified by H.R. 8157, introduced by Representative Moss of California, was modeled on legislation that had been proposed by the National Commission on Product Safety and recommended the creation of an independent regulatory commission having authority in the field of consumer product safety. Although most of the debate at the hearings, and

later within committee, focused on this major difference between the two bills, some attention was also focused on the differences between the provisions governing information disclosure.

The Administration bill, H.R. 8110, contained a provision nearly identical to section 6 as it was eventually enacted. Section 4(c) of H.R. 8110 provided:

(1) Nothing contained in this Act shall be deemed to require the release of any information described by subsection (b) of section 552, title 5, United States Code, or which is otherwise protected by law from disclosure to the public. The Secretary shall not make public information obtained by him under this Act which would disclose trade secrets, formulas, processes, costs, methods of doing business, or other competitive information not otherwise available to the general public; or the names or other means of identification of ill or injured persons without their express written consent.

(2)(A) Except as provided by subparagraph (B) of this paragraph, not less than thirty days prior to his public disclosure of any information obtained under this Act, or to be disclosed to the public in connection therewith, the Secretary shall provide such information to each manufacturer of any consumer product to which such information pertains, if the manner in which such consumer product is to be designated or described in such information will permit the public to ascertain readily the identity of such manufacturer, and shall provide such manufacturer with a reasonable opportunity to submit comments to the Secretary in regard to such information. Upon the request of such manufacturer, the Secretary shall publish such comments or a fair summary thereof, or a statement of the manufacturer of reasonable length in lieu thereof, concurrently and in association with the disclosure of the information to which such comments or statement appertain. The Secretary shall take reasonable steps to assure, prior to his public disclosure thereof, that information from which the identity of such manufacturer

may be readily ascertained is accurate, and· that such disclosure is fair in the circumstances and reasonably related to effectuating the purposes of this Act. If the Secretary finds that, in the administration of this Act, he has made public disclosure of inaccurate or misleading information which reflects adversely upon the safety of any consumer product, or the practices of any manufacturer of, distributor of, importer of, or dealer in consumer products, he shall, in a manner similar to that in which such disclosure was made, publish a retraction of such inaccurate or misleading information.

(B) Subparagraph (A) (except for the last sentence thereof) shall not apply to the public disclosure of (i) information about any consumer product with respect to which product the Attorney General has filed an action (or an action against a manufacturer thereof with respect to such product) under section 12, or which the Secretary has reasonable cause to believe is in violation of section 15, or (ii) information about any administrative or judicial proceeding under this Act.

*Reprinted in Subcommittee Hearings, supra* at 7–9. An examination of the foregoing provision reveals that the operative information disclosure requirements of H.R. 8110, absent the requirement that the Commission publish manufacturers' comments, were enacted into law in section 6(b). On the other hand, the information disclosure provisions in the Moss bill were far less restrictive. Section 19(d) of H.R. 8157 simply provided:

When the Commission finds that publication of any information obtained by it is in the public interest and would not give an unfair competitive advantage to any person, it is authorized to publish such information in the form and manner deemed best adapted for public use, except that data and information which relates to a trade secret, shall be held confidential and shall not be disclosed, unless the Commission determines that it is necessary to carry out the purposes of this Act.

*Reprinted in Subcommittee Hearings, supra* at 68–69. At the opening of the hearings, Representative Moss, Subcommittee Chairman, listed the information disclosure provisions of the two bills among the significant differences to be explored by the subcommittee. Moreover, in commenting upon those provisions of H.R. 8110 that would later be enacted in section 6(a)(2) of the CPSA, he stated that "I am sure the subcommittee will want to examine carefully this proposed change in the Freedom of Information Act." *Id.* 300.

Many of the witnesses who testified before the subcommittee commented on the differences between the two versions of the proposed legislation respecting the Commission's (or Secretary's) authority to disseminate information to the public. Contrary to the Commission's contention here, however, we do not find those comments to support the view that manufacturers feared the impact of adverse publicity when generated by a government agency, to the exclusion of a more general apprehension about the disclosure of misleading or inaccurate information. Thus, while the prepared statement of James F. Young, Vice President of General Electric Company, included an admonition that the public dissemination of premature, inaccurate or misleading information, "[i]ssued under the dignity and with the apparent imprimatur of the U.S. Government," could have serious impacts upon reputation, good will and the product market, *id.* 1065, others who spoke in behalf of H.R. 8110 favored its disclosure provisions on more general grounds. For example, Bernard H. Falk, President of the National Electrical Manufacturers Association, stated that "[n]o information should be disclosed which is inaccurate, misleading or incomplete." *Id.* 1197. The prepared statement of George P. Lamb, General Counsel for the Association of Home Appliance Manufacturers, included this passage:

> Authority to collect and disseminate information carries with it a responsibility not to disclose data that may injure a company or reveal confidential information. A statute establishing a standards-setting agency should state explicitly, as

do many other federal statutes, that confidential data are not to be disseminated. A statute should also assure that any information to be made public is accurate, and that if it is derogatory the company it identifies has had an opportunity to refute it. H.R. 8110 contains provisions in § 4(c) that would accomplish this. *Id.* 1237.

Moreover, we believe that the most authoritative reading of the intended scope of section 4(c) of the Administration's bill is that provided to the subcommittee by HEW, the agency which drafted H.R. 8110. In HEW's section-by-section analysis of the bill, it stated:

> *Section 4(c)* would protect the Secretary's refusal to disclose information not required to be released by the [FOIA], and would expressly prohibit his disclosure of commercial secrets, or of illness or injury data revealing [the] identity of the victim.

> It would also require the provision of thirty days notice to the manufacturer of any consumer product prior to the Secretary's public disclosure of information respecting that product, if such information would reveal the manufacturer's identity.

. . .

*Id.* 188. Clearly, the Commission's argument that section 6(b)(1)'s particular requirements were intended to be applicable only to Commission-initiated information disclosure is not borne out by HEW's analysis of section 4(c). Section 4(c), like section 6 of the CPSA as enacted, covers both the affirmative disclosure of information to the public in the form of press releases and the like, and the release of information under the FOIA. Yet there is no indication in the passage quoted above supporting the Commission's view that the particular requirements of section 4(c)(2) (which was to become section 6(b)(1)) were intended to be read as applicable only to the former methods of information disclosure. Rather, HEW's analysis made no distinction between the methods of information disclosure that were to be covered by sections 4(c)(1) and 4(c)(2).

The Commission's assertion that Congress intended section 6(b)(1) to be applied only to affirmative methods of disclosure because those methods entail the possibility of enhanced harm to manufacturers' reputations that would result from the public dissemination of adverse information carrying the imprimatur of government, is likewise unsupported by committee reports and the House debates on the CPSA. The House Committee on Interstate and Foreign Commerce, in incorporating the provisions of section 4(c) of the Administration bill into H.R. 15003, made no distinction between those aspects of section 6 expressly governing FOIA requests and the provisions of section 6(b)(1). Rather, the Committee analyzed the information disclosure provisions of the proposed act as follows:

If the Commission is to act responsibly and with adequate basis, it must have complete and full access to information relevant to its statutory responsibilities. Accordingly, the committee has built into this bill broad information-gathering powers. It recognizes that in so doing it has recommended giving the Commission the means of gaining access to a great deal of information which would not otherwise be available to the public or to Government. Much of this relates to trade secrets or other sensitive cost and competitive information. Accordingly, the committee has written into section 6 of the bill detailed requirements and limitations relating to the Commission's authority to disclose information which it acquires in the conduct of its responsibilities under this act.

Subsection (a) makes clear that nothing in this act shall be deemed to compel the Commission to disclose information which would not otherwise be available to the public under the Freedom of Information Act (5 U.S.C. 552(b)). There is one exception to this requirement. The Freedom of Information Act would not require a Federal agency to permit public access to investigatory files compiled for law enforcement purposes. Section 25(c) of this bill qualifies the Commission's authority to deny access to investigatory files by

making accident investigations specifically available to the public so long as they do not identify injured parties or attending physicians (unless a release is obtained from such persons).

Subsection (a)(2) contains an absolute prohibition against the Commission's disclosure of trade secrets and other information referred to in section 1905 of title 18—except to other officers or employees concerned with carrying out responsibilities under this act or when relevant in any proceeding under this act. . . .

Before disseminating any information which identifies the manufacturer or private labeler of a product, the Commission is directed to give the manufacturer or private labeler 30 days in which to comment on the proposed disclosure of information. This procedure is intended to permit the manufacturer or private labeler an opportunity to come forward with explanatory data or other relevant information for the Commission's consideration. There is no intention that the Commission be required to include a manufacturer's or private labeler's explanation in the materials which it determines to disseminate at the end of the 30-day period. This was suggested to the committee and rejected.

The committee recognizes that the Commission has a responsibility to assure that the information which it disseminates is truthful and accurate. Where it is discovered that the disclosure of information has been inaccurate or misleading and reflects adversely on the safety of a consumer product or the practices of any manufacturer, distributor, or retailer of the product, the Commission is directed to publish a retraction in a manner similar to that in which the original disclosure was made. . . .

*House Report, supra* at 31–32. Throughout this passage the committee spoke of requirements and limitations relating to the Commission's disclosure and dissemination of information acquired in the course of conducting its statutory responsibilities. Some of those requirements and limitations

expressly clarify the Commission's authority to disclose information under the FOIA. There is no indication in the committee report that the requirement of 30 day notice "before disseminating any information" and the requirement that the information which the Commission "disseminates is truthful and accurate" were not also meant to apply to the "disclosure" of information under the FOIA.

The Commission places great reliance on the debates on section 6 which took place on the floor of the House as support for its assertion that the purpose of section 6(b)(1) was to prevent the injury to a manufacturer's reputation that could only arise from adverse publicity initiated and approved by the government. A fair reading of those debates, however, does not support the Commission's contention. Representative Moss, speaking in support of H.R. 15003, described it as "contain[ing] careful provisions protecting against the unnecessary disclosure of trade secrets and other confidential information," an element of the proposed legislation making it clear that it "will be fair to business." 118 Cong.Rec. 31,378 (1972). Representative Broyhill, of North Carolina, who along with Moss had served on the subcommittee that had conducted hearings on the bill, also spoke in its support. He stated that the bill required the Commission "to notify each manufacturer of its *intent to release any information* at least 30 days prior to disclosure and after an opportunity for comment." 118 Cong.Rec. 31,381 (1972) (emphasis supplied). These statements by the bill's proponents certainly do not support the Commission's view that Congress meant to distinguish affirmative disclosure from the mere passive release of information pursuant to the FOIA.

The remarks of Representative Crane of Illinois concerning the evils of government-initiated adverse publicity lend little credence to the Commission's interpretation. Representative Crane spoke *against* the bill's passage, stating that "the creation of a Consumer Product Safety Commission, is an intrinsic part of the growing attack upon private business, and the effort to place business under the control of a huge new Government bureaucracy." 118 Cong.Rec. 31,389 (1972). As an example of the injuries that Government regulation had inflicted upon the nation's economy in the past he cited the financial damage incurred by the DuPont Company when the Federal Trade Commission publicly charged, without basis, that the Company had engaged in false advertising. The fact that Crane, an opponent of the CPSA, saw the potential in it for similar events to occur in the Commission's regulation of consumer products, *in spite of the protective provisions of section 6(b)(1)*, provides no inkling of support for the Commission's view that that section is limited to the affirmative disclosure of information.

When the conference committee resolved the differences between the versions of the CPSA that had been passed by the House and Senate, it incorporated the House provisions respecting information disclosure. The conferees' description of section 6(b)(1) is instructive in that the accuracy and fairness requirements for "publicly disclosed information" are mentioned in almost the same breath as the description of section 6(a)(1), stating that no information need be "publicly disclosed" by the Commission if it is exempt from disclosure under the FOIA:

> The Commission was directed to take steps to assure that publicly disclosed information from which specific manufacturers or distributors could be identified was accurate and that the disclosure was fair in the circumstances and reasonably related to carrying out its duties. No information would be required to be publicly disclosed if it is information described in section 552(b), title 5, United States Code (relating to information which is entitled to be protected from public access under the Freedom of Information Act), or which is otherwise protected by law from disclosure to the public.

*Conference Report, supra* at 40–41, *reprinted in* [1972] U.S.Code Cong. & Admin. News, pp. 4596, 4633.

We conclude that the only reasonable inference that can be drawn from the legislative history of section 6(b)(1) is that the members of the Administration who introduced it, the legislators who drafted it, reported it favorably for consideration by the House and then spoke in favor of its enactment, and the conferees who incorporated it into the final legislative product, did not intend that its protections from the misleading, inaccurate and unfair public dissemination of information were to be applied only to what the Commission refers to as affirmative disclosures. There is not an inkling of support in the legislative history for the distinction the Commission has attempted to make between the scope of section 6(a) and that of section 6(b). The legislative history of the CPSA thus reinforces the inference that we drew from the language of the statute itself. We turn then to the Commission's argument that two subsequent events have demonstrated the reasonableness of its interpretation of section 6(b)(1).

The more significant of those events was the statement by the conferees on the Consumer Product Safety Commission Improvements Act of 1976 in adopting new section 29(e) of the Act. *See* page 33 *supra*. The provisions of section 6(b) were incorporated by reference in section 29(e) and the conferees stated that such incorporation was "not intended . . . to supersede or conflict with the requirements of the [FOIA]." Adopting the view of section 6(b)(1) pressed by the Commission here, the conferees went on to state that that section "relates to public disclosure initiated by the Federal agency while the [FOIA] relates to disclosure initiated by a specific request from a member of the public . . . ." *Improvements Act Conference Report, supra* at 27, *reprinted in* [1976] U.S.Code Cong. & Admin. News, pp. 1017, 1029.

In construing the effect of the latter statement on the statutory authority of the Commission to construe section 6(b)(1) as inapplicable to the release of information pursuant to an FOIA request we are reminded that "the views of a subsequent Congress form a hazardous basis for infer-

ring the intent of an earlier one." *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960), *quoted in United States v. Philadelphia National Bank*, 374 U.S. 321, 348–49, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). The Commission contends that this is an appropriate occasion for the invocation of the equally venerable, if somewhat inconsistent, maxim which holds that "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." *Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969) (footnote omitted). Of course, in this case the Commission is not relying on subsequent legislation as a declaration of Congress's earlier intent in enacting section 6(b)(1), but rather relies on a statement of the conference committee which approved that legislation. Without resolving the dispute as to which of the two maxims is more applicable in such situations generally, we believe that an examination of the statement of the conference committee, in its legislative context, reveals that it does form a hazardous basis for construing congressional intent in enacting section 6(b)(1).

First, we reiterate that section 29(e), by its terms, does not interpret the scope of section 6(b). Second, the conference committee statement was made in the context of approving legislation that contained numerous and extensive amendments to the Consumer Product Safety Act; yet the problem before us here was not otherwise addressed by Congress in enacting the Improvements Act. The interpretation of section 6(b) espoused by the conferees was not mentioned by the House committee that drafted the Improvements Act. *See* H.R. Rep.No.94–325, 94th Cong., 1st Sess. 18 (1975). The Senate version of the Improvements Act did not contain a provision amending section 29. *Improvements Act Conference Report, supra* at 26, *reprinted in* [1976] U.S.Code Cong. & Admin. News, pp. 1017, 1028. In the debates in the House the amendment to section 29, and the relationship between section 6(b) and the FOIA,

were not mentioned. Nor was the conferees' interpretation of section 6(b) mentioned in either House when the conference report was debated. *See* 122 Cong.Rec. 10,811 (House approval of the conference report); *id.* 11,585 (Senate approval) (1976). Given our view that the legislative history of section 6(b)(1) itself strongly supports an inference that the Commission's interpretation of that provision conflicts with the intent of the Congress that enacted it, we are unwilling to accept the isolated, and in our view erroneous, conclusion of a later congressional committee as persuasive authority to the contrary.

The Commission argues that the conference report is certainly authoritative as to Congress's intent with respect to section 29(e) itself and suggests that it would be anomalous for the provisions of section 6(b)(1) to be applicable to FOIA requests for information from the Commission itself but inapplicable to FOIA requests for information that had been obtained by other federal agencies from the Commission. The scope of section 29(e) is not before us in this litigation, so we need express no view as to the validity of the conferees' suggestion with respect to its proper interpretation. In addressing ourselves to the asserted anomaly, however, we note that section 25(c) of the CPSA, by its terms, applies the requirements of section 6(b)(1) to FOIA requests for accident investigation reports. It would be equally anomalous for section 6(b)(1) to be applicable to the release of some categories of Commission documents requested under the FOIA but not others, when nothing in the language or history of either section 6(b)(1) or section 25(c) contemplates such a distinction.

The second item of subsequent legislative history relied upon by the Commission is an exchange that took place between Richard O. Simpson, Chairman of the Commission, and Representative Moss during an oversight hearing on regulatory reform. During that hearing Chairman Simpson reported that the Commission had adopted "an extremely liberal interpretation" of the FOIA, one requiring release of all requested material, notwithstanding the availability of exemptions granting the Commission the discretion to deny a request. He went on to note the issue raised in this lawsuit, and stated: "The Commission has been dealing with this problem by interpreting section 6(b) as applying only to affirmative disclosures by the Commission, and the Freedom of Information Act as applying to passive release of information." In response, Representative Moss replied: "As the primary author of both acts, I am inclined to agree with you." *Regulatory Reform: Hearings Before the Subcomm. on Oversight and Investigation of the Comm. on Interstate and Foreign Commerce*, 94th Cong., 2d Sess. Vol. IV, 7–8 (1976) [hereinafter *Oversight Hearings*].

It goes without saying that the views of a single member of Congress concerning the appropriate interpretation of a statutory provision passed some years earlier are not dispositive. As the Supreme Court only recently stated in *Chrysler Corp. v. Brown, supra,* —— U.S. at ——, 99 S.Ct. at 1722, "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." And notwithstanding Representative Moss' claimed authorship of the CPSA generally, it should be recognized that he was not a sponsor of the bill that provided that legislation with its provisions governing information disclosure. *See* pages 806 807 *supra.* Moreover, Chairman Simpson submitted to the oversight subcommittee a proposed amendment to section 6(b)(2) that would have added the release of information by the Commission under the FOIA to the list of exceptions from the requirements of section 6(b)(1). *Oversight Hearings, supra* at 8. That proposed amendment has never been reported out of committee.

Our analysis of the language and legislative history of section 6(b)(1) leads us to conclude that Congress did not intend that provision to apply only to Commission press releases, news conferences, publication of reports and other forms of "affirmative disclosure" of information obtained under the Act. Rather, our analysis leads to the conclusion that the information disclosure re-

quirements of the CPSA were meant to protect manufacturers from the harmful effects of inaccurate or misleading public disclosure by the Commission, through any means, of material obtained pursuant to its broad information-gathering powers. The policies designed to be served by section 6(b)(1) would be severely undermined, if not eviscerated, were the Commission's interpretation to prevail. As noted by the House Committee which drafted section 6 of the Act, the Commission was given broad information-gathering authority, giving it the means of gaining access to information not otherwise available to the public or the government. Section 6(b)(1) was designed to insure that the Commission's authority to release such information would be limited, and that its responsibility to assure that information disseminated to the public be both accurate and fairly presented would be recognized.

The Commission argues that the interpretation of section 6(b)(1) which we have reached here, at least tentatively, renders that section inconsistent with the scheme of the FOIA, and that to carry out the intentions of both statutes we must adopt its interpretation of section 6(b)(1). The Court of Appeals for the Second Circuit has agreed that the adoption of the Commission's interpretation of section 6(b)(1) has the salutary effect of avoiding a potential conflict between the CPSA and the FOIA. *See Pierce & Stevens, supra* at 1388. However, the Court of Appeals reached its conclusion that such a potential conflict exists without analyzing the effect that a holding that section 6(b)(1) is a withholding statute within Exemption 3 of the FOIA might have on the apparent inconsistencies between the two statutes. *Id.* 1389.

### D.

The Commission notes that the FOIA requires that it determine within ten working days whether or not it will comply with a request for documents within its files, and to thereafter make prompt disclosure to the requesting party. *See* 5 U.S.C. § 552(a)(6)(A) & (C). It contends that com-

pliance with those requirements would be rendered impossible if it must apply the requirements of section 6(b)(1) to any request for information that would identify an individual manufacturer. First, 30 days notice would have to be given the manufacturer prior to compliance with the FOIA request; second, the Commission would have to take reasonable steps to assure that the information contained in the requested documents was accurate, and that its release would be fair and consistent with the legislative purposes of the CPSA. The Commission argues that the long delays that would, in all probability, accompany compliance with section 6(b)(1) would defeat the intent of the FOIA.

This argument assumes that the Commission would be required to comply with the time limitations of the FOIA in spite of the independent requirements of section 6(b)(1). However, federal agencies have the discretion to refuse FOIA requests if the requested material falls within one of the nine statutory exemptions set forth in 5 U.S.C. § 552(b). Exemption 3 of the FOIA, which the district court held was applicable to the material requested here, provides that the FOIA does not apply to matters that are

> specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld . . . .

5 U.S.C. § 552(b)(3). If the district court was correct in its conclusion that section 6(b)(1) is a withholding statute within Exemption 3 and that the requested material was covered by that statute, then the asserted inconsistencies between the provisions of section 6(b)(1) and the requirements of the FOIA may be rendered less telling. For example, if the Commission were to receive an FOIA request for material that it had gathered in such a fashion that its release would be obviously unfair, or if the material obviously portrayed a factual situ-

ation inaccurately, the Commission would have no difficulty in immediately informing the requester that the material was exempt from disclosure under Exemption 3. If the Commission had doubts about the accuracy of the material requested, or the fairness of its disclosure, and was unable to take reasonable steps to remedy the situation within 10 working days it might inform the requester that release of the information would be denied pending compliance with the terms of section 6(b)(1). In either event, the Commission's determination that the requested material was in fact exempted from disclosure by Exemption 3's incorporation of section 6(b)(1) would be subject to timely appeal to the agency head and to the district court. On the other hand, if the Commission determined that the material requested was accurate, and that disclosure would be fair under the circumstances and would effectuate the statutory purposes, it could inform the requester that release would be forthcoming pending 30 days notice to the manufacturers identified in that material. The 30 day notice and comment period prior to actual disclosure is not irreconcilable with the requirement of the FOIA that "[u]pon any determination by an agency to comply with a request for records, the records shall be made *promptly available* to such person making such request." 5 U.S.C. § 552(a)(6)(C) (emphasis supplied).

Such inconsistencies as exist between the two statutes are not unusual or uncontemplated by Congress. By the very fact that Exemption 3 incorporates specific nondisclosure statutes into the general scheme of the FOIA, inconsistencies will arise as agencies attempt to comply with those specific statutes while processing FOIA requests. Exemption 3 was designed to provide the agencies with the flexibility needed to accommodate those inconsistencies.

We conclude that the perceived inconsistencies between section 6(b)(1) and the FOIA will be minimized if the former provision is, in fact, a withholding statute within the meaning of Exemption 3, granting the Commission the discretion not to disclose material subject to its provisions. Furthermore, if the Commission were to abuse that

discretion in a particular case, either by refusing to disclose material not covered by section 6(b)(1) or by disclosing material without complying with its provisions, the injured party will have access to the courts to review the Commission's determination.

The district court found that section 6(b)(1), in requiring the Commission to take reasonable steps to assure accuracy, fairness, and the service of a statutory purpose prior to disclosing information identifying individual manufacturers, established particular criteria for withholding within the meaning of Exemption 3. *See* 443 F.Supp. at 1157–60. The Commission argues that because Congress did not intend section 6(b)(1) to apply to FOIA requests at all, it cannot be deemed to be a statute exempting material from disclosure under the FOIA. Our reading of section 6(b)(1) and its legislative history disposes of that argument. Amicus, Consumer Federation of America, argues that the requirements of section 6(b)(1) are not framed with sufficient particularity to render it an Exemption 3 withholding statute; the plaintiffs have argued the opposing position.

Exemption 3 was amended in 1976 by section 5(b) of the Government in the Sunshine Act, Pub.L. No. 94–409, 90 Stat. 1247, to further define those statutes that "specifically exempt" material from disclosure. The Conference Report to the Sunshine Act states that the amendment was intended "to overrule the decision of the Supreme Court in *Administrator, FAA v. Robertson*, 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975), which dealt with section 1104 of the Federal Aviation Act of 1958 (49 U.S.C. 1504)." H.R.Conf.Rep.No.94–1441, 94th Cong., 2d Sess. 25, *reprinted in* [1976] U.S. Code Cong. & Admin. News, pp. 2183, 2244, 2261. In *Robertson*, the Court held that a statute permitting the FAA to withhold information from public disclosure "when, in their judgment, a disclosure of such information would adversely affect the interests of [an objecting party] and is not required in the interest of the public," 49 U.S.C. § 1504, was an Exemption 3 withholding statute. The amendment to Ex-

emption 3 was designed to eliminate from its terms those statutes that granted such broad administrative discretion concerning the disclosure or nondisclosure of material within the agency's possession. Thus, the report of the House Government Operations Committee on the Sunshine Act, recommending the legislative overruling of *Robertson*, states:

> Believing that the decision misconceives the intent of exemption (3), the committee recommends that the exemption be amended to exempt only material required to be withheld from the public by any statute establishing particular criteria or referring to particular types of information. The committee is of the opinion that this change would eliminate the gap created in the Freedom of Information Act by the *Robertson* case without in any way endangering statutes such as the Atomic Energy Act of 1954, 42 U.S.C. §§ 2161–66, which provides explicitly for the protection of certain nuclear data.
>
> Under the amendment, the provision of the Federal Aviation Act of 1958 that was the subject of *Robertson*, and which affords the FAA Administrator *carte blanche* to withhold any information he pleases, would not come within exemption 3. . . .

H.R.Rep.No.94–880 (Part I), 94th Cong., 2d Sess. 23 *reprinted in* [1976] U.S.Code Cong. & Admin. News, pp. 2183, 2205.

Several courts of appeals have had the opportunity to construe the scope of Exemption 3 following its amendment. The District of Columbia Circuit has stated that "[n]ondisclosure is countenanced [by subsection (B) of the exemption] if, but only if, the enactment is the product of *congressional appreciation* of the dangers inherent in airing particular data and incorporates a formula whereby the administrator may determine precisely *whether disclosure in any instance would pose the hazard that Congress foresaw.*" *American Jewish Congress v. Kreps*, 187 U.S.App.D.C. 413, 417–18, 574 F.2d 624, 628–29 (1978) (emphasis supplied). *See Chamberlain v. Kurtz*, 589 F.2d 827, 839 (5th Cir. 1979) (Congress did not enact a provision excluding all statutes from Exemption 3 that left an agency with any discretion over the disclosure of information; "it merely required that this discretion be limited to certain defined matters or that it be informed by established criteria.").

The Ninth Circuit has recently concluded that the intent of the amendment to Exemption 3 was "unmistakably to adopt" the reasoning of a pre-*Robertson* opinion of this Court in which we held that Exemption 3 can only be applied to statutes prescribing some standards or guides through which legislative judgment is reflected in the making of an administrative disclosure determination. *Lee Pharmaceuticals v. Kreps*, 577 F.2d 610, 615 (9th Cir. 1978), *cert. denied*, —— U.S. ——, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979) (citing *Stretch v. Weinberger*, 495 F.2d 639 (3d Cir. 1974)). *See also* Note, *Developments under the Freedom of Information Act—1976*, 1977 Duke L.J. 532, 535 (The amendment "has made clear when the FOIA refers to information specifically exempted from disclosure by *statute*, it truly means exempted by statute, and not by an agency's ad hoc determination that the information ought not to be released.").

Our examination of the language and history of section 6(b)(1) has revealed that Congress made a considered judgment that the Commission was not to release information identifying particular manufacturers unless it first notified those manufacturers of its intent to do so and took reasonable steps to satisfy itself of the accuracy and fairness of disclosure. We agree with the district court's conclusion that section 6(b)(1) is a statute of the kind described by amended Exemption 3. The requirements of that section do not afford the Commission "'unfettered and unguided' power . . . to withhold information," *Lee Pharmaceuticals, supra* at 615; rather nondisclosure is authorized only when information from which the identity of a manufacturer may be readily ascertained and when the Commission has not taken (or cannot take) reasonable steps to assure that disclo-

sure would be accurate, fair and related to the Act's purposes. The standards set forth in section 6(b)(1) are sufficiently definite that they provide a reviewing Court with criteria to measure the Commission's compliance with Congress's intent.[5]

Having concluded that section 6(b)(1) is a statute of the kind described by Exemption 3, we would ordinarily turn to the question whether the material at issue is within the nondisclosure provisions contemplated by the statute. *See National Commission on Law Enforcement and Social Justice v. Central Intelligence Agency*, 576 F.2d 1373, 1376 (9th Cir. 1978). In this case, however, the Commission has conceded that it cannot release the material at issue in its present form, if we hold that it is required to take the reasonable steps provided for in section 6(b)(1).

Thus, we conclude that the material requested of the Commission was exempt from mandatory disclosure under the FOIA itself. Given our conclusion that section 6(b)(1) is an Exemption 3 withholding statute, we find no inconsistencies between the requirements of that section and the provisions of the FOIA that would compel us to reconsider our tentative conclusion that Congress intended section 6(b)(1) to be applied to the release of Commission documents pursuant to an FOIA request.

### E.

In our view, this case illustrates the potential for Congress's design to be eviscerated by the Commission's proposed interpretation of section 6(b)(1). Congress's concern that manufacturers might be harmed by the public disclosure of inaccurate and misleading information obtained by the Commission is implicated in this case to the same extent that it would be implicated by a Commission press release. The Commission obtained the material at issue, otherwise unavailable to the public, through its information-gathering authority under the CPSA. The Commission's methods of defining and assembling the requested data rendered it inaccurate and would make its publication misleading. Moreover, once the Commission released the data to the public it would have no control over the use to which it might be put by the requesters.[6] The circumstances of this case thus reinforce our view that the Commission's interpretation of section 6(b)(1) is not a reasonable one, and is, in fact, inconsistent with the avowed intent of the Congress that enacted that provision. We hold that the district court did not err in concluding that the Commission's determination to release the TV-related accident data without first complying with the requirements of section 6(b)(1) was beyond its statutory authority.

### IV.

We indicated in Part II above that this Court should consider whether affirmance of the district court's order might be condi-

**5.** Our conclusion that section 6(b)(1) is a withholding statute within amended Exemption 3 is consistent with the view of the only commentator to have addressed the issue. *See* Note, *The Effect of the 1976 Amendment to Exemption Three of the Freedom of Information Act*, 76 Colum.L.Rev. 1029, 1045 n.100 (1976). Of course, implicit within the author's conclusion is a rejection of the Commission's view that section 6(b)(1) applies only to information disclosure that it affirmatively initiates.

**6.** We note that in this case one of the requesters, Consumers Union, is the publisher of the magazine *Consumer Reports*. That fact makes it apparent that the disclosure of the information at issue, even absent the Commission's imprimatur, may have widespread adverse effects on plaintiffs' business reputations. In a leading article on the subject of adverse agency publicity as a method of regulatory control, and its possible abuses, Professor Ernest Gellhorn has argued that affirmative forms of publicity must generally be distinguished from agency practices with respect to the FOIA. But he notes:

> When media coverage closely follows agency activities, affirmative publicity measures may be unnecessary because mere freedom of public access to information performs the same function. . . . In such a case, the issues involved in the Freedom of Information Act cannot be disentangled from adverse publicity issues.

Gellhorn, *Adverse Publicity by Administrative Agencies*, 86 Harv.L.Rev. 1380, 1422 n.164 (1973). This case is illustrative of the problem foreseen by Professor Gellhorn.

tioned upon such modification as would accommodate the interests of the requesters, absent from this litigation. Having decided that the district court's conclusions of law were correct, we are led to agree that the plaintiffs here are entitled to permanent injunctive relief from the Commission's threatened disclosure of the materials at issue. *See* note 2 *supra.* No lesser measure of relief would serve to protect the interests at stake and vindicate the plaintiffs' legal right to have the Commission perform its statutory duties under section 6(b)(1) of the Consumer Product Safety Act.

Thus, the judgment of the district court will be affirmed in its entirety.